UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

_____

JON SNYDER and SHORELINE APPRAISAL
SERVICES INC, individually and on behalf of all others
similarly situated,

Plaintiff,

v.

DOMINICK R. DALE, ESQ., individually, and THE LAW
OFFICE OF DOMINICK R. DALE, ESQ.,

Defendants.

_____

Civ. A. No. _____

**CLASS ACTION
COMPLAINT**

Jon Snyder ("Snyder") and Shoreline Appraisal Services Inc. ("Shoreline" collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, for their class action Complaint as against Defendants Dominick R. Dale, Esq., individually ("Dale"), and The Law Office of Dominick R. Dale, Esq. (the "Law Office", and together with Dale, the "Defendants"), allege and state as follows:

<u>**NATURE OF ACTION**</u>

1.      Defendants have engaged in a wide-ranging fraudulent scheme designed to strip small businesses and their individual owners out of their last remaining cash by using a network of companies and law firms to target financially vulnerable merchants leading them to believe they may receive debt-relief services, while providing little, if any, debt-relief services (in exchange for illegal fees and false claims of legal assistance).

2.      The scheme targets merchants who have taken out merchant cash advance ("MCA") agreements and are struggling to keep their doors open. Because attorneys are not permitted to directly solicit clients, Defendants have conspired with debt relief companies to

indirectly solicit merchants through so-called litigation insurance programs, wherein the debt relief company solicits and signs up the client, and then shares their fee directly with Defendants.

3.    Defendants are paid, in part, based on the number of filings made on behalf of the merchant clients.  As a direct result of this financial motivation, Defendants file cookie-cutter pleadings, including verified answers and oppositions to motions for summary judgment—without ever speaking to the client.

4.    In this case, Defendants filed an answer on behalf of Plaintiffs, served discovery, opposed a motion for summary judgment, and attended an in-person oral argument in an action where—*Defendants were never even served*—let alone made aware of the action.

5.    Instead, Defendants trolled the New York State Court System, found that an action had been filed against Plaintiffs, and then filed a *verified answer* without even advising Plaintiffs that they had been sued.

6.    Even worse, Defendants completely ignored discovery requests that had been filed on the docket on October 18, 2024, resulting in the waiver of Defendants' rights.

7.    To be clear, Defendants filed an answer, served discovery, defended against a motion for summary judgment, and completely ignored all discovery requests—without an executed retainer—and without even informing Plaintiffs of these various filings.

8.    In reality, the scheme is nothing more than a money grab where a third-party, non attorney solicits the client, steers them into litigation, and then shares the proceeds with Defendants until the well goes dry.  Once every last penny has been stripped from these small businesses and their individual owners, Defendants quickly move to withdraw as counsel and leave their so-called "clients" on the curb to fend for themselves.

9.     The actions of Defendants have dire consequences far beyond the money grab. Rather than advise small businesses and their owners of their rights under the MCA agreements, like, among other things, how to utilize the reconciliation provision to obtain a potential refund and/or lower payments, Defendants have conspired with third-party debt settlement companies to encourage litigation by advising merchants to stop making payments and to stop communicating with the MCA companies, resulting in an immediate default and potential business-ending consequences.

10.     In addition to flooding the New York Court System with scores of unnecessary litigation, the scheme triggers catastrophic default remedies that are designed to cripple a small business, such as the sending of UCC letters instructing a business's customers to direct payment to the MCA company instead of to the small business.   The result is often the loss of desperately needed cash and irreparable damage to the customer relationship.

11.     The damages caused by Defendants is also direct and proximate. Among other damages, Defendants have increased the cost of attorney's fees incurred by the MCA company in collecting upon the MCA agreement.  Defendants engaged in scorched-earth litigation without even advising Plaintiffs that the litigation was ongoing, let alone that the underlying MCA agreement required Plaintiffs to pay the MCA company's litigation costs and fees.

12.     Plaintiffs are not alone.  Defendants have appeared in hundreds of actions filing the same verified pleadings, discovery requests, and motion papers, increasing the liability of the Putative Class Members.

13.     The conduct here is so outrageous, willful and wanton that punitive damages are warranted to punish Defendants and to deter others from engaging in similar unlawful conduct.

## JURISDICTION, VENUE AND CHOICE OF LAW

14.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

16.     This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

17.     Venue is proper because each Defendant regularly conducts business within this judicial district.

## PARTIES

18.     Plaintiff Snyder is an individual who now and at all relevant times resides in Valparaiso, Indiana. Snyder is the founder and owner of Shoreline, a business which provides real estate appraisal services in Indiana, Illinois, and Southwest Florida.

19.     Plaintiff Shoreline is a corporation engaged in providing appraisal services incorporated under the laws of the State of Indiana, with its principal place of business in Indiana.

20.     Defendant Dale is an individual residing at 7002 Nansen Street, Forest Hills, New York 11375.

21.     The Law Office is a sole proprietorship of Dale and maintains its principal place of business at 7002 Nansen Street, Forest Hills, New York 11375.

- 4 -

### THE COMMON FRAUDULENT SCHEME

22.     Various funders provide receivables-based financing to small businesses ("merchants") pursuant to certain receivables purchase agreements (an "RPA," also commonly known as a "merchant cash advance" or "MCA").  Under these RPAs, merchants purport to sell a portion of their future receivables to the funder (the "Purchased Amount" of receivables) in exchange for an upfront, discounted purchase price (the "Purchase Price") paid to the merchant.

23.     Legitimate RPA financing allows merchants who possess a demonstrated history of positive receivable generation, who may otherwise have difficulty obtaining financing on an expedited basis (often because they have maxed out their traditional lines of credit), to gain access to desperately needed capital.

24.     To facilitate RPA transactions, the merchants typically agree to hold their respective receivables in trust for the benefit of their funder; to remit a portion of their daily, weekly, or monthly receivables in the manner agreed to under the respective RPA; and to grant the funder a general security interest in their receivables up and until the Purchased Amount of receivables is satisfied.

25.     Importantly, the RPAs typically provide specific adjustment and reconciliation provisions for merchants who experience a decline in receivables generation, or even business closure, to obtain relief directly from the funders.  A merchant in need of an adjustment (to reduce remittance amounts) or reconciliation (to correct for overcollection) is entitled to make a formal request to the funder, which would include copies of bank statements.  If the requesting merchant's receivables have declined, the funder is typically obligated to remit or adjust accordingly.

26.     The merchant does not need to engage a "debt settlement" company to exercise its rights to request an adjustment or reconciliation under its respective RPA with their funder.

**The Emergence of Fraudulent and Deceptive**
**Debt Settlement Companies**

27.     Nonetheless, over the last few years, a cottage industry of these "debt settlement" companies has emerged (the "Debt Settlement Companies").

28.     Certain Debt Settlement Companies prey on small business merchants to the detriment of both the funder and the merchant, all the while enriching themselves.

29.     In January 2024, the Consumer Financial Protection Bureau ("CFPB") and seven (7) state attorneys general sued one of these Debt Settlement Companies, having alleged that the company was running an illegal debt-relief enterprise.  The seven states who have joined in the CFPB's lawsuit are Colorado, Delaware, Illinois, Minnesota, New York, North Carolina, and Wisconsin.  A true and correct copy of the press release issued by the CFPB is attached hereto as **Exhibit A**.

30.     The CFPB and attorneys general allege that the enterprise has collected hundreds of millions of dollars in exorbitant, illegal fees from vulnerable consumers—consumers who are often merchants such as the Plaintiffs.  The CFPB and attorneys general request that the court permanently enjoin the enterprise's illegal actions, order redress for consumers, and impose a civil monetary penalty.

31.     CFPB Director Rohit Chopra states that the "operators of this scheme established a network of shell companies and law firms to hide their illegal activities from law enforcement" and that the "CFPB and state attorneys general are seeking to shut down this outfit's illegal activity."

32.     The modus operandi of this debt relief scam relies upon promises that the respective Debt Settlement Company and its network of law firms and lawyers will negotiate lower debt repayments on behalf of the respective merchants.

33.     The Debt Settlement Companies, such as MCAR, persuade the merchants to execute debt settlement agreements as between the respective merchant and Debt Settlement Company (the "Debt Settlement Agreements").

34.     To get the merchants to agree, the Debt Settlement Companies dupe the merchants into believing that their obligation to the purchaser will be settled for a fraction of the merchant's obligation.

35.     As part of these Debt Settlement Agreements, the Debt Settlement Company requires merchants to make immediate payments into an escrow account held solely in the Debt Settlement Company's name (the merchant's "Escrow Account") held by yet another party, such as SAS.

36.     Long before settling any debts, much less beginning negotiations, however, the Debt Settlement Company collects fees from the Escrow Account and siphons those funds under the guise and false pretense that those funds would be used or leveraged to negotiate a lower debt repayment on behalf of the merchant.

37.     In reality, none of these fees are used for such purpose and benefit only the Debt Settlement Company—to the merchant's detriment.

38.     The Debt Settlement Companies also charge a percentage of the ***total enrolled debt*** under any relevant Debt Settlement Agreement—***not*** just a fee based upon what is actually saved or the work performed by the company.  For example, if the total enrolled debt by a merchant is $500,000.00, the Debt Settlement Company will charge $125,000.00 to "settle" the debt.

39.     In sham Debt Settlement schemes, such as here, the merchant often increases their overall liability because they now owe both the funder and the Debt Settlement Company—with no resulting discount on the amount owed to the funder.

40.    As detailed in the Debt Settlement Agreements, the Debt Settlement Company debits the merchant's bank accounts via ACH debit and deposits these funds into an account with an escrow agent such as SAS, an "escrow" account company used primarily for this scam.

41.    The funds debited and held in the Escrow Account by the escrow agents are applied to the various fees the Debt Settlement Company charges.

42.    Many unscrupulous Debt Settlement Companies are operating in New York using an identical business model and are preying upon small businesses across the country.

43.    Numerous merchants, including the Plaintiffs have been, and continue to be, duped into believing that the funds paid into the Escrow Account are being used to pay their creditors, but instead are being siphoned by the Debt Settlement Companies as "fees."

44.    To affect this scam, the Debt Settlement Companies must ensure that their merchants are not wise to the fraudulent fee scheme.

45.    If legal action is taken or the merchant's creditor's attorneys get involved, the Debt Settlement Company risks not being paid by the merchant.

46.    As a direct result, merchants like Plaintiffs here are never informed that they have been sued and have ghost litigations proceeding without their knowledge or consent.

**Defendants' Involvement
in the Debt Settlement Companies' Scheme**

47.    As part of the Debt Settlement Companies' fraudulent scheme, the Debt Settlement Companies engage attorneys to act on their respective merchant's behalf in negotiating or dealing with a potential litigation commenced by a merchant's creditor.

48.    In order to effectuate this plan, the Debt Settlement Company will engage a legal plan company, such as non-party The Citadel Business Legal Plan LLC ("Citadel"), to locate and retain attorneys in the state in which the litigation was commenced.

49.    These attorneys are selected by Citadel, not the merchant, they are paid by Citadel (who in turn paid by the Debt Settlement Company), and they rarely if ever communicate with the merchants.

50.    In most, if not all, instances, the merchants do not actually engage these attorneys.

51.    In most, if not all, instances, the merchants do not have an attorney-client relationship with any of these attorneys or law firms.

52.    In most, if not all, instances, an attorney-client relationship, if any, exists as between the Debt Settlement Company and the law firm or attorney.

53.    The Debt Settlement Companies direct the various law firms and attorneys whom they engage to do everything in their power to cause a resolution of these matters favorable to them and not to their merchant.

54.    Often, and is more fully discussed below, these law firms and attorneys enter appearances in and engage in vexatious and dilatory litigation tactics on behalf of the merchant, but the merchant has ***no idea*** that an attorney is acting on its/his/her behalf in any pending litigation, all to that merchant's detriment.

55.    The law firms know that these merchants do not actually engage them through traditional attorney-client means, yet they continue to enter appearances and file fraudulently verified pleadings and other court papers on behalf of parties with whom they have no attorney-client relationship.

56.    The Debt Settlement Companies engage attorneys like Defendants, among others, for one purpose—to delay legal proceedings long enough so that the Debt Settlement Company can fraudulently siphon enough money from the unsuspecting merchant to cover its "fees" and then disappear.

57.     Once the Debt Settlement Company receives its full "fee," these law firms and attorneys no longer care about the legal proceedings commenced against their merchants and, in many instances (as the Dale Defendants often do), routinely fail to appear for hearings, neglect to respond to or otherwise engage in traditional litigation practices, and ultimately file motions to withdraw as counsel.

58.     The Defendants' goal is simple—do the least amount of actual work possible, maximize delay, and recoup a significant and underserved windfall.

59.     To do so, Debt Settlement Companies fraudulently misrepresent that they possess: (1) technology sophisticated enough to negotiate lower remittance rates with respect to a particular RPA; and (2) relationships with RPA funders that would allow the merchant to obtain a significant reduction in the number of receivables it originally pledged to the funder on a particular RPA.

60.     In addition, the Debt Settlement Companies fraudulently misrepresent to any potential merchant that they have a network of attorneys—like the Dale Defendants—who will act on the merchant's behalf in any litigation related to a default under the terms of a particular RPA.

61.     Importantly, the Debt Settlement Companies never worked to establish an attorney-client relationship between the respective merchant and any attorney.

62.     Defendants are participants in the foregoing network of deceit perpetrated by these Debt Settlement Companies.

63.     The Debt Settlement Companies often have no unique connection to or relationship with any funder, nor do they possess any ability to negotiate a lower remittance rate or reduction in receivables with a particular funder on behalf of any funder.  And more often than not, the relationship is exactly the opposite:  Many MCA funders refuse to work with Debt Settlement

Companies and have express prohibitions in their contracts.  In fact, some MCA agreements expressly invoke a default in the event that a merchant enrolls in a debt settlement program.

64.     Instead, the Debt Settlement Companies, together with their network of attorneys—like Defendants—fraudulently induce, through deception and collusion, the particular merchants to breach their respective RPA so that the Debt Settlement Companies can exert control over the merchant's funds to demand that the funders comprise the balance of remittances and/or future receivables be paid to the Debt Settlement Companies instead of the funder.

65.     The Debt Settlement Companies fraudulently obtain control over the balance of remittances and/or future receivables otherwise owing to the merchant and convert the funds into profit for the Debt Settlement Companies, and when the merchant can no longer make payments, the Debt Settlement Companies declare a default and instruct their attorneys, like Defendants, to immediately withdraw from all pending litigations.

66.     These Debt Settlement Companies require that the merchant cease all communication with their particular RPA funder, and they convince the merchant that they should not turnover any remittances and/or future receivables to the funder and should instead pay those remittances and/or future receivables to the relevant Debt Settlement Company.

67.     In doing so, the Debt Settlement Companies fraudulently misrepresent to the merchant that those remittances and/or future receivables will be used solely to resolve the merchant's obligations to the funder.

68.     Instead, by inducing the merchants to breach their RPAs with funders, the merchant continues to accrue obligations and digs itself a deeper hole, all while the Defendants reap the proceeds paid to them by the merchant that should have otherwise been used to restructure and/or renegotiate the particular merchant's obligations.

69. Any funds, whether through past remittances and/or future receivables, obtained by these Debt Settlement Companies are applied immediately to the Debt Settlement Companies' fees and costs. They are not applied to the merchant's obligations to their respective funders.

70. In the event the funder files a lawsuit to recover against one of its merchants for breach of the RPA, among other things, the Debt Settlement Companies engage attorneys—like Defendants—to engage in unauthorized litigation in the New York State Court System.

71. This unauthorized practice of law by Defendants constitutes a fraud on the courts of this State.

72. To be clear, under no circumstance do these Debt Settlement Companies provide an authorized engagement letter to their merchant(s) for representation by Defendants.

73. Rather, as is evident here, Defendants fail to communicate with merchants and verify filings without their knowledge or consent.

74. Plaintiff here did not engage, and has not engaged, Defendants to represent them in matters adverse to merchants.

75. Plaintiff is not an outlier. Numerous other merchants did not engage Defendants and did not authorize Defendants, despite the multitude of filings made on their behalf.

76. The Debt Settlement Companies engage Defendants, among others, to represent the various merchants seeking the assistance of the Debt Settlement Companies.

77. In doing so, the Debt Settlement Companies fraudulently mispresent to the merchants that the relevant merchant has an attorney-client relationship with a particular attorney—here, Defendants.

78. The Debt Settlement Companies possess no authority to create such attorney-client relationship.

79.     The attorney-client relationships apparently created by way of the Debt Settlement Companies' agreements with its merchants are fraudulent and deceitful and violate the Model Rules of Professional Conduct.

80.     These fraudulent attorney-client relationships serve to benefit both the Debt Settlement Companies and the Dale Defendants, and only further expose the relevant merchant to liability under the terms of its original RPA with the funder.

**Defendants' Direct Involvement
with Debt Settlement Companies**

81.     Defendants play an integral role in defrauding merchants, like the Plaintiffs.

82.     Most often, Defendants file verbatim pleadings—answers, counterclaims, demands, and motions to transfer venue, etc.—that contain nonsensical and, frankly, wrong responses to the funders' express allegations of breach of contract, among other claims, and baseless reasons to transfer venue, many of which have been rejected by Courts across this State, all without any input from the actual "client."

83.     These filings often contain boilerplate affirmative defenses, many of which do not apply in any sense to the actual litigation they are filed in.

84.     In most cases, and specifically in this action, Defendants have ***no communication*** with their purported client (because it is not actually their client).

85.     Defendants only communicate with the Debt Settlement Companies.

86.     As a result, when confronted with motions to dismiss and lengthy discovery demands, Defendants cannot act in their respective "alleged client's" best interest because they cannot provide any specificity or particularity as to their counterclaims or alleged defenses.

87.    In almost all cases, just weeks after filing these types of fraudulent and baseless pleadings on behalf of their "alleged clients," Defendants move to withdraw as counsel citing various fraudulent reasons for doing so.

88.    In almost all cases, Defendants miss deadlines, whether Court imposed or otherwise, for the provision of discovery demands and/or motion responses.

89.    The reason for these delay tactics is simple—Defendants have no attorney-client relationship with the merchant they purport to represent.

90.    Defendants have not represented their respective "clients" and/or their actual clients, the Debt Settlement Companies, in an ethical manner under the Model Rules of Professional Conduct.

91.    Instead, Defendants have acted in a collusive manner in conjunction with the Debt Settlement Companies to cause merchants like the plaintiffs to breach their respective RPAs with funders.

92.    Defendants have clearly collectively engaged in a frivolous and fraudulent scheme to allow the Defendants to enrich themselves off the backs of struggling small businesses across the county, including the Plaintiffs.

93.    Defendants' conduct herein is part of a larger pattern of conduct between and amongst these parties and is directed at the public generally and more importantly, this Court.

### FACTS SPECIFIC TO PLAINTIFFS

**Shoreline's Business**

94.    Snyder is the founder and owner of Shoreline, a business that provides real estate appraisal services in Indiana, Illinois, and Southwest Florida.

95.    Shoreline was founded by Snyder in 1998 and maintained relative success for over 25 years.

96.    In or around mid-2023 Shoreline, was in need of a temporary cash infusion and entered into various financing agreements with funders.

97.    Specifically, on or about June 6, 2023, Shoreline entered into an RPA with non-party "RDM Capital Funding LLC dba Fintap" ("RDM"), whereby RDM purported to purchase $19,800 of Shoreline's future receivables for an upfront immediate cash infusion of $15,000, less applicable fees (the "RDM Agreement"). A true and correct copy of the RDM Agreement is annexed hereto as Exhibit B.

98.    Pursuant to the RDM Agreement, 6.12% of Shoreline's weekly receivables, initially estimated at $450 per week, was to be remitted by Shoreline to RDM. Snyder executed a personal guarantee.

99.    In or around July 2023, Shoreline began experiencing further financial difficulties and was not able to initially meet its obligations pursuant to the RDM Agreement.

**Shoreline is Contacted by MCAR**

100.    In or around October 2023 "Chirstopher Ayala"[1] from CDR contacted Snyder with various promises to reduce the total amount of debt owed and the weekly obligations.

101.    After the call, Christopher Ayalah sent an email memorializing the promises including but not limited to reducing the total amount owed by more than 60% exclusive of fees, with a total savings of more than 25% inclusive of all fees.  Specifically, Mr. Ayalah stated that the quote program cost includes "all attorney expenses, setting up the escrow account, negotiations

---

[1] Likely an alias.

and settlements" and payments to the creditors. A true and correct copy of this email is annexed hereto as Exhibit C.

102.    Relying upon these representations, on October 28, 2023, Plaintiffs entered into a Business Debt Resolution and Settlement Agreement with CDR's non-party affiliated company MCA Resolve LLC ("MCAR").

103.    Pursuant to the Agreement, Shoreline "enrolled" $198,399 of total debt owed to various creditors.

104.    In exchange for this "enrollment" Shoreline was to pay a 10% "retainer fee" in the amount of $19,839,90.

105.    In addition, MCAR charged a "nonrefundable fee" of 20% of the TOTAL DEBT enrolled of $39,679.80.

106.    The total fees due to MCAR prior to them resolving the accounts, making the settlement payments or even so much as making a single phone call was 30% of the total debt owed by Shoreline, or a relatively colossal $59,515.70.

107.    As an inducement to pay these outrageous fees, MCAR falsely estimated that it would reduce the debt by 57% to a total of $85,311.57, for a total savings of $113,087.43.

108.    Plaintiff's Estimated Settlement Amount had no basis in fact and was intentionally misrepresented to fraudulently induce Plaintiff into entering into the MCAR Agreement.

109.    Included in the package of the initial contract with MCAR, was a "Citadel Business Legal Plan Membership Agreement" (the "Citadel Agreement") and a Trust Accounting Agreement with non-party Secure Account Service LLC ("SAS") (the "SAS Agreement").

110.     The MCAR Agreement provided that the merchant was to make weekly payments in the amount of $2,058.99 via automated ACH debit to a purported Escrow account held by SAS for the first 10 weeks and then decrease the payment to $2,177.25 for an additional 59 weeks.

111.     The MCAR Agreement further provided that MCAR was to retain the entirety of the first 10 weekly payments as a retainer fee ($20,589.90) which is more than the MCA Agreement provides; $1,475.07 from the following 26 payments; $1,327.89 from the next payment for program fees (for a total of $39,679.71); and $55.00 in service fees from each payment other than the first ten payments for the  successive payment (for a total of $3,245).

112.     In doing so, in the first 37 weeks of the "program" essentially pays itself nearly $62,000, while leaving a measly $17,621 to settle Shoreline's debts.

113.     MCAR has collected more than $50,000 without doing anything.

114.     Pursuant to the MCAR Agreement the funds in the escrow account "shall be for the exclusive purpose of collecting funds for settlement payments and [MCAR's] fees." Furthermore, it states that Shoreline "will always own and control the Settlement Account."

115.     The MCAR Agreement further contains an "Addendum to Agreement," which provides that MCAR shall "appoint an attorney of its choice and pay all legal expenses, if any, associated with the civil defense of [Shoreline]" in any enforcement actions.  Additionally, MCAR was to "pay all legal expenses in the event that [Snyder] is named individually in addition to [Shoreline]."

116.     Thus, Plaintiffs were led to believe that all fees they were paying to MCAR would include the cost of any litigations.

**The Citadel Agreement**

117.    Pursuant to the Citadel Agreement Plaintiffs were to pay a "one time enrollment fee" of $750 and a "Monthly Membership Maintenance Fee" of $100 per month.

118.    The Citadel Agreement provided that in the event an action was commenced against the Plaintiffs, Citadel would "provide [Plaintiffs] with an attorney, pay 100% of that attorney's fees, and pay 100% of the court costs and/or arbitration related fees and costs."

119.    The Citadel Agreement directly references, and by so doing, incorporates the terms of the MCAR Agreement.

120.    The Citadel Agreement contained an ACH Authorization Form to allow Citadel to withdraw the Enrollment Fee and the Monthly Fee directly from the Plaintiffs, and not MCAR.

121.    Thus, despite the MCAR Agreement stating that MCAR should be responsible for all of Plaintiffs' legal fees, it appears that the Citadel Agreement required the *Plaintiffs* to make these enrollment and monthly payments.

**The Dale Agreement**

122.    On December 12, 2023, Plaintiffs received an unsolicited Email from the Dale Defendants with a letter and an "Attorney-Client Retainer Agreement." A true and correct copy of this letter is annexed hereto as Exhibit D.

123.    Pursuant to the Agreement, Plaintiffs would retain the Dale Defendants to "provide legal services in connection with the civil litigation defense." Such representation was to include "all motion practice, preparation of all paperwork, arguments and evidence, court appearances and advice to client."

124.    The proposed agreement specifically stated that the attorneys fees for this representation "shall be paid by [Plaintiffs'] third-party insurance fund/consolidation company"

and specifically stated that "no payments shall be due from client" and "no payments shall be due from client due to the representation in question."

125.    Furthermore, all expenses, other than expert fees were to be paid by the same third party "unless separate arrangements are made."

126.    Plaintiffs never executed the Dale Agreement and had no further contact with or from Defendants.

**The Defendants' Fraudulent Scheme Emerges**

127.    At the direction of MCAR, Shoreline stopped making remittances to RDM. At that time, there was a balance of unremitted receivables pursuant to the RDM Agreement in the amount of $13,495.00 ("RDM Balance").

128.    MCAR knew based on its prior experiences with other Merchants that its advice to Plaintiff to perform actions that would constitute an event of default under Plaintiff's financial obligations to its creditors would have adverse and detrimental legal consequences to Plaintiff.

129.    MCAR knew based on its prior experiences with other Merchants, that following such advice would most likely result in Plaintiff being sued by RDM for breach of contract.

130.    MCAR did not disclose to Plaintiff what legal actions would result from taking such actions that would cause a default with its creditors.

131.    Pursuant to Section 2(d) of the MCAR Agreement, MCAR "…do[es] not provide legal, tax, or bankruptcy advice".

132.    MCAR did in fact provide legal advice to Plaintiff, which Plaintiff materially and detrimentally relied upon, and which advice resulted in adverse legal actions to Plaintiff.

133.    Plaintiffs then stopped making the remittances to RDM, at the direction of MCAR.

134.    As a result, on November 15, 2023, RDM commenced an against as against Plaintiffs seeking damages in the amount of $16,195.00. A true and correct copy of the Summons and Verified Complaint in the RDM Action is annexed hereto as Exhibit E.

135.    Despite that, on December 12, 2023 (the same day the agreement was sent to Plaintiffs), Defendants filed a "verified answer And affirmative defenses" in the RDM Action. A true and correct copy of this answer is annexed hereto as Exhibit F.

136.    At no time was a draft of this answer provided to the Plaintiffs.

137.    At no time did Defendants speak with the Plaintiffs with respect to the draft of the verified answer.

138.    Defendants executed an "Attorney Verification" of the answer.

139.    Further, on December 12, 2023, the Dale Defendants filed a Motion to dismiss the action. A copy of the Notice of Motion is annexed hereto as Exhibit G.

140.    At no time did the Dale Defendants discuss the matter with the Plaintiffs and inform them of their intent to file a motion to dismiss.

141.    On April 12, 2024, RDM filed a motion for summary judgment seeking summary judgment on the RDM Action.

142.    At no time did Defendants inform Plaintiffs that such a motion was filed.

143.    At no time did Defendants discuss the matter to determine either factual or legal basis for a denial of the Motion with the Plaintiffs. Instead, Mr. Dale filed an opposition on June 21, 2024.

144.    Plaintiffs never received advanced copy of the opposition, nor where they provided an opportunity to review or provide input in the opposition.

145.    Essentially, throughout the course of the RDM Action, Defendants did not *actually* represent Plaintiffs, and in fact behaved in every manner (except in representations to the court) as if they did not represent the Plaintiffs.

146.    In or around late June 2024, Defendants sent a request for payment to Plaintiffs, seeking payment of approximately $18,000 for fees associated with Defendants "representation" of Plaintiffs in the RDM Action. Defendants did not provide Plaintiffs with any invoice setting forth the time spent, actions taken, and expenses incurred with respect to this request for payment.

147.    Plaintiffs were surprised at this request especially considering the fact that the entire RDM Balance was less than $13,500, and even the total amount demanded in the RDM Action was significantly less than the "legal" fees accrued by the Defendants.

148.    Thereafter, on July 1, 2024, Defendants sent a revised "Request for Payment" which contained a link to "LawPay" with a prefilled amount of $3,500, essentially revising Defendants' demand for payment from $18,000 to $3,500, without explanation. A true and correct copy with the email request for payment along with a screenshot of the link is annexed hereto as Exhibit H.

149.    Once again, Defendants did not provide Plaintiffs with any invoice setting forth the time spent, actions taken, and expenses incurred with respect to the this request for payment.

150.    Furthermore, pursuant to MCAR Agreement, the Citadel Agreement and even the unsigned Dale Agreement, there was no legitimate reason for Defendants to demand or request payment for *any* invoices as they should have been paid through either MCAR or Citadel.

151.    As of the date of this complaint, nearly one year after the MCAR Agreement was executed, and after Plaintiffs made payments to MCAR in excess of $50,000, none of Plaintiffs debts have been resolved, settled, discounted, or otherwise dealt with by the Defendants.

152.    Upon information and belief, neither MCAR, Citadel nor Defendants made any attempts to resolve any of the debts.

153.    Pursuant to Section 4(a) of the MCAR Agreement, Plaintiff was prohibited from communicating with its creditors whose debts were enrolled into the Program.

154.    Under the MCAR Agreement, "If [Plaintiff] directly negotiate[s] with, enter[s] a settlement agreement with, make[s] payment to, or withdraw[s] a creditor from this Program, [MCAR] shall be entitled to a fee of Twenty Percent (20)% of the balance then owing to that creditor, and the creditor shall be immediately removed from the Program."

155.    Instead, the entire point of the sham debt settlement offer was to enrich the pockets of Defendants at the expense of the Plaintiffs, all the while failing to resolve the debts of the Plaintiffs resulting in further damages, including but not limited to interest, increased costs, decreased creditworthiness, and prejudicial judicial filings made without knowledge or consent.

156.    As a result of the foregoing, Plaintiffs are entitled to damages inclusive of an award of punitive damages on account of the Defendants' high degree of moral turpitude and inappropriate conduct.

## CLASS ACTION ALLEGATIONS

157.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following classes:

a.    **The Legal Malpractice Class**: All persons merchants, customers and clients in the State of New York who fell victim to Defendants' direct collusive effort to commit fraud on and via the Court, during the Class Period (the "Legal Malpractice Class") as a result of Defendants' conduct in connection with the Enterprise.

b.    __The Violation of Judiciary Law Class__: All persons merchants, customers and clients in the State of New York who fell victim to Dale Defendants' direct collusive effort to commit fraud on and via the Court, during the Class Period (the "Violation of Judiciary Law Class") as a result of Defendants' conduct in connection with the Enterprise.

158.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

159.    The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

**Numerosity**:  The exact number of members of the Classes is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes likely numbers in the hundreds.

**Commonality and Predominance**:  There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class but are not limited to the following:

a)   Whether Defendants engaged in the unauthorized practice of law;

b) Whether Defendants violated the New York Rules of Professional Responsibility;

c) Whether Defendants engaged in a scheme to defraud;

d) Whether Defendants made misrepresentations to courts in violation of NY Judiciary Law;

e) Whether Defendants' conduct was outrageous, willful, and wanton.

**Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

**Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes

**Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the

Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF N.Y. JUDICIARY LAW § 487)**

160.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein. Defendants engage in fraudulent, deceitful, and unauthorized conduct on behalf of Plaintiffs.

161.    Defendants never maintained an attorney-client relationship of any kind with the Plaintiffs.

162.    Defendants have no actual attorney-client relationship with the Plaintiffs.

163.    Nevertheless, Defendants appeared in litigation purportedly on behalf of the Plaintiffs.

164.    Defendants fraudulently verified each of the filings, stating that they need to do so because the Law Office is located outside the County in which the merchant does business.

165.    In reality, while the locales may be true, Defendants verify these pleadings because they cannot have their alleged client do so—because the Plaintiffs are not really the Law Office's or Dale's client.

166.    This conduct violates N.Y. Judiciary Law § 487 because it amounts to a direct collusive effort by the Defendants to commit fraud on the courts of New York.

167.    Defendants intentionally deceived multiple courts of this State by misrepresenting that the Law Office and/or Dale had been retained and/or obtained express authorization from their purported merchant clients to assert the defenses and counterclaims interposed, or to make other unauthorized filings.

168.    Plaintiff has been injured as a result of the Defendants' conduct in an amount to be determined at trial, but no less than $75,000, plus costs, interest, and fees.

169.    Plaintiffs are also entitled to an award of treble damages as a result of Defendants' fraudulent and deceitful conduct under N.Y. Judiciary Law § 487.

## SECOND CAUSE OF ACTION
### (LEGAL MALPRACTICE)

170.    Plaintiffs repeat and reallege the allegations contained above.

171.    Alternatively, in the event that an attorney-client relation is found to exist between Defendants and Plaintiffs, Defendants failed to exercise the degree of care, skill and diligence commonly possessed and exercised by members of the legal community.

172.    Further, the Defendants engaged in fraudulent, deceitful, and unauthorized conduct on behalf of Plaintiffs, and continued to enter appearances and file fraudulently verified pleadings and other court papers on behalf of Plaintiffs.

173.    Defendants delayed legal proceedings long enough so that the Debt Settlement Company can fraudulently siphon enough money from the unsuspecting merchant to cover its "fees" and then disappear.

174.    Defendants routinely failed to appear for hearings, neglect to respond to or otherwise engage in traditional litigation practices, and ultimately file motions to withdraw as counsel.

175.     Defendants further failed to advise Plaintiffs that an action had been filed or that by engaging in motion practice, and discovery, Plaintiffs would be liable for the increased attorney's fees and costs incurred by RDM.

176.     Defendants' negligence was a proximate cause of the injuries sustained by the Plaintiffs, as but for the Defendants' negligence, the Plaintiffs would not have sustained injuries.

177.     Plaintiffs were in fact injured as a result of the Defendants' conduct in an amount to be determined at trial, but no less than $75,000.00, plus costs, interest, and fees.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment for against Defendants as follows:

a)     Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

b)     Enjoining Defendants from engaging in their unlawful conduct;

c)     Awarding the Plaintiffs and Class Members direct and consequential damages;

d)     Awarding Plaintiffs and the Class Members punitive damages;

e)     Awarding Plaintiffs and the Class Members their attorney's fees and costs incurred in this action; and

f)     Granting such other and further relief as this Court deems just and proper.

DATED:     New York, New York
           November 22, 2024


                    **WHITE AND WILLIAMS LLP**


                    By: _____

- 27 -

Shane R. Heskin
810 Seventh Avenue, Suite 500
New York, NY  10019
(212) 244-9500 or (215) 864-6329
heskins@whiteandwilliams.com

**BERKOVITCH & BOUSKILA, PLLC**


By:  */s/ ariel bouskila*
Ariel Bouskila
Steven Berkovitch
1545 US 202 Suite 101
Pomona, NY 10970
212-729-1477
ari@Bblawpllc.com