**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _10/30/2025_

---

JON SNYDER and SHORELINE APPRAISAL
SERVICES INC., individually and on
behalf of all others similarly situated,

              Plaintiffs,

        - against -

DOMINICK R. DALE, ESQ., individually,
and THE LAW OFFICE OF DOMINICK R. DALE,
ESQ.,

              Defendants.

**24 CV 8940(VM)**

**DECISION AND ORDER**

---

**VICTOR MARRERO, United States District Judge.**

Plaintiffs Jon Snyder and Shoreline Appraisal Services Inc. ("Shoreline," and together with Snyder, "Snyder"), individually and on behalf of all others similarly situated, brought this class action pursuant to Federal Rule of Civil Procedure ("Rule") 23(a) and Rule 23(b)(3) against defendants Dominick R. Dale, Esq. and the Law Office of Dominick R. Dale, Esq. (together "Dale"), claiming violations of N.Y. Judiciary Law § 487 ("Judiciary Law Section 487") and legal malpractice. (See "Complaint" or "Compl.," Dkt. No. 1.) Dale now moves to dismiss the claims pursuant to: (1) Rule 12(b)(1) for lack of subject matter jurisdiction under 28 U.S.C. § 1332(a) ("Section 1332(a)") and 28 U.S.C. § 1332(d) ("Section 1332(d)"); and (2) Rule 12(b)(6) for failure to state a claim.

1

(See "MTD," Dkt. No. 24.) For the reasons set forth below, Dale's motion to dismiss is **GRANTED**. Snyder fails to show that the amount in controversy meets the jurisdictional minimum. Therefore, this Court lacks subject matter jurisdiction under Section 1332(a) and Section 1332(d).

## I.    BACKGROUND[1]

Snyder, an Indiana resident, is the founder and owner of Shoreline, a real estate appraisal business incorporated in Indiana that provides services in Indiana, Illinois, and Florida. (See Compl. ¶¶ 18-19.) Dale, a New York resident, owns the Law Office of Dominick R. Dale, Esq., located in New York. (See id. ¶¶ 20-21.) On June 6, 2023, Shoreline – in need of temporary financing – entered into a receivables purchase agreement ("the RPA"), also known as a merchant cash advance, with RDM Capital Funding LLC dba Fintap ("RDM"). (See id. ¶¶ 22, 97.) RDM is a funder that provides receivables-based financing to merchants. (See id. ¶ 22.) Under a typical receivables-based financing agreement, a merchant sells a portion of its future receivables to RDM in exchange for an upfront, discounted purchase price paid to the merchant. (See id.)

---

[1] Except as otherwise noted, the following background derives from Snyder's Complaint. (See Dkt. No. 1.)

2

Under the RPA Shoreline signed with RDM, RDM purchased $19,800 of Shoreline's future receivables for $15,000. (See id. ¶ 97.) Pursuant to the terms of the RPA, Shoreline was to remit a set percentage of its receivables to RDM on a weekly basis. (See id. ¶ 98.) During the following months, Shoreline's finances declined further, and it was not able to meet its obligations under the RPA. (See id. ¶ 99.) In October 2023, Shoreline entered into a business debt resolution and settlement agreement (the "MCAR Agreement") with a debt settlement company, MCA Resolve LLC ("MCA"). (See id. ¶ 102.) According to Snyder, companies such as MCA operate "debt relief scams," whereby they and their networks of lawyers promise to negotiate lower debt repayments on behalf of merchants similar to Shoreline and "dupe" small businesses "into believing that their obligation to the purchaser will be settled for a fraction of the merchant's obligation." (Id. ¶¶ 6, 32-34.) Snyder contends that the debt settlement companies "charge a percentage of the total enrolled debt" – which often increases a merchant's overall liability, as the companies never actually negotiate any discount to the debt owed to the original lender. (Id. ¶¶ 38-39.) Snyder asserts that many debt settlement companies operate in New York – "preying upon" small businesses by siphoning fees and

3

prompting lenders such as RDM to turn around and sue the small businesses after they stop making payments under their receivables purchase agreement. (Id. ¶¶ 43-46.)

Pursuant to Shoreline's MCAR Agreement with MCA, Shoreline agreed to enroll nearly $200,000 of debt and pay MCA almost $60,000 in fees. (See id. ¶¶ 103-05.) In return, MCA estimated it would reduce Shoreline's debt by fifty-seven percent. (See id. ¶ 107.) The MCAR Agreement also contained an addendum stipulating that MCA would "appoint an attorney of its choice and pay all legal expenses, if any, associated with the civil defense" of Shoreline or Snyder individually. (Id. ¶ 115.) Additionally, as part of the MCAR Agreement, Snyder signed a separate legal plan membership agreement (the "Citadel Agreement") with Citadel Business Legal Plan LLC ("Citadel"). (See id. ¶ 109.) According to Snyder, MCA engages with legal plan companies such as Citadel to select attorneys to represent merchants in "ghost litigations" against their original lenders, whereby the attorneys do not communicate or form an actual attorney-client relationship with the merchants. (Id. ¶¶ 46-56.) Snyder alleges that this "collusive" set-up ensures that the small businesses "are not wise to the fraudulent fee scheme," enabling the debt

settlement companies to continue to get paid. (Id. ¶¶ 44, 91.)

Pursuant to the Citadel Agreement – which incorporated the terms of the MCA Agreement – Citadel would "provide [Snyder] with an attorney, pay 100% of that attorney's fees, and pay 100% of the court costs and/or arbitration related fees and costs" if an action was brought against him. (Id. ¶ 118.) In November 2023, RDM did, indeed, bring an action against Snyder, seeking $16,195 in damages, after Snyder – "at the direction of [MCA]" and its "legal advice" – stopped making payments to RDM. (Id. ¶¶ 127-34; id. at Ex. E.) Snyder alleges that MCA knew its advice would "most likely result in [Snyder] being sued by RDM" and never disclosed "what legal actions would result." (Id. ¶ 129.) Snyder also claims he was never served or "made aware" of the action. (Id. ¶ 4.)

Snyder received a letter and retainer agreement (the "Dale Agreement") via email from Dale on December 12, 2023. (See id. ¶ 122; id. at Ex. D.) The Dale Agreement stipulated that Dale would "provide legal services in connection with the civil litigation defense" and that all fees would be paid by Snyder's "third-party insurance fund/consolidation company." (Id. ¶¶ 123-24.) Snyder never signed the Dale Agreement or made further contact with Dale. (See id. ¶ 126.)

The same day Snyder received Dale's email - December 12, 2023 - Dale filed an answer and affirmative defenses in the action brought by RDM, as well as a motion to dismiss. (<u>See</u> <u>id.</u> ¶¶ 135-40; <u>id.</u> at Ex. F, Ex. G.) After RDM filed a motion for summary judgment in April 2024, Dale filed an opposition and appeared at an oral argument on Snyder's behalf. (<u>See</u> <u>id.</u> ¶¶ 4, 141.) The Court denied RDM's motion on June 28, 2024. (<u>See</u> "Marshall Decl.," Dkt. No. 25 at Ex. F.) In late June 2024, Dale sent Snyder a request for payment, seeking approximately $18,000 in fees. (<u>See</u> Compl. ¶ 146.) On July 1, 2024, Snyder sent a "revised" request for payment for $3,500. (<u>Id.</u> ¶ 148.) On November 21, 2024, attorneys associated with the law firm Berkovitch & Bouskila PLLC ("B&B") filed notices of appearance on behalf of Snyder in the RDM action. (<u>See</u> Marshall Decl. at Ex. H.) The RDM action is still pending, and MCA has not resolved, settled, or discounted Snyder's debt. (<u>See</u> <u>id.</u> ¶ 51.)

## II.  <u>PROCEDURAL HISTORY</u>

Snyder initiated this class action on November 22, 2024, asserting claims for violations of Judiciary Law Section 487 and for legal malpractice. (<u>See</u> Compl. ¶¶ 160-77.) After completion of the pre-motion letter exchange outlined in this Court's Individual Practice II.B, Dale filed the pending

motion to dismiss on April 8, 2025 (<u>see</u> MTD), supported by a memorandum of law. (<u>See</u> "Memorandum" or "Mem.," Dkt. No. 26.) On May 30, 2025, Snyder filed an opposition to the motion. (<u>See</u> "Opposition" or "Opp'n," Dkt. No. 29.) On July 3, 2025, Dale filed a reply in support of his motion. (<u>See</u> "Reply," Dkt. No. 32.)

### III. <u>LEGAL STANDARD</u>

When the matter before the Court involves a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), the Court must consider the Rule 12(b)(1) motion first because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." <u>Gannon v. 31 Essex St. LLC</u>, No. 22-CV-1134, 2023 WL 199287, at *2 (S.D.N.Y. Jan. 17, 2023) (internal quotation marks and citation omitted).

Pursuant to Rule 12(b)(1), the Court must dismiss a case for lack of subject matter jurisdiction if the Court "lacks the statutory or constitutional power to adjudicate it." <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). The party asserting subject matter jurisdiction bears the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. <u>See Morrison v. Nat'l Australia Bank Ltd.</u>, 547 F.3d 167, 170 (2d

Cir. 2008) (citation omitted). "[T]he court must take all facts alleged in the complaint as true," Nat. Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) (citation omitted), but "no presumptive truthfulness attaches to the complaint's jurisdictional allegations." Guadagno v. Wallack Ader Levithan Assocs., 932 F. Supp. 94, 95 (S.D.N.Y. 1996).

When evaluating a Rule 12(b)(1) motion, the Court may consider evidence outside of the pleadings to resolve the disputed jurisdictional fact issues. See Zappia Middle East Construction Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000). "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The plaintiff must allege

8

sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, In re Elevator Antitrust Litig., 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. Twombly, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Sikhs for Justice v. Nath, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (citation omitted). Indeed, "the purpose of [Rule] 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." Halebian v. Berv, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. See Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir.

9

2009). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." Doe v. N.Y. Univ., No. 20-CV-1343, 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (citation omitted).

## IV. DISCUSSION

Dale moves to dismiss both claims pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, arguing that Snyder fails to meet the amount-in-controversy requirements of both Section 1332(a) and Section 1332(d). (See Mem. at 6-9.) Dale also asserts that, even if Section 1332(d)'s jurisdictional requirements are met, two exceptions to the Class Action Fairness Act ("CAFA") – the home state exception and the local controversy exception – separately foreclose this Court's jurisdiction. (See id. at 9-11.) Finally, Dale moves to dismiss pursuant to Rule 12(b)(6), arguing that Snyder fails to state a claim for violations of Judiciary Law Section 487 and for legal malpractice. (See id. at 11-17.) Here, the Court finds that it lacks subject matter jurisdiction over the claims, as Snyder does not sufficiently demonstrate that he satisfies the amount-in-controversy thresholds of either Section 1332(a) or Section 1332(d) and, additionally, both CAFA exceptions apply. Because the Court

dismisses on those bases, it does not address Dale's argument that Snyder additionally fails to state a claim pursuant to Rule 12(b)(6).

    A.   <u>Section 1332(d) Jurisdiction</u>

        1.   <u>Amount in Controversy</u>

Pursuant to Section 1332(d) and under the provisions of CAFA, district courts have original federal jurisdiction over any class action in which (1) the proposed class contains at least 100 members, (2) any member of the class is a citizen of a state different from any defendant, and (3) the amount in controversy, as determined by the aggregated claims of the class, exceeds $5 million, exclusive of interest and costs. <u>See</u> 28 U.S.C. § 1332(d); <u>Blockbuster, Inc. v. Galeno</u>, 472 F.3d 53, 56 (2d Cir. 2006). Here, the parties dispute only whether the amount in controversy of the present litigation exceeds $5 million, exclusive of interest and costs. <u>See</u> 28 U.S.C. § 1332(d)(2).

Snyder, as the party asserting subject matter jurisdiction, must carry the burden of establishing, by a preponderance of the evidence, that the Court has jurisdiction pursuant to CAFA. <u>See</u> <u>Blockbuster</u>, 472 F.3d at 57-58; <u>see also</u> <u>DiTolla v. Doral Dental IPA of New York</u>, 469 F.3d 271, 275 (2d Cir. 2006) (finding that CAFA did not change

11

the traditional rule that the party asserting federal
jurisdiction bears the burden of establishing jurisdiction).
Where "the aggregate amount in controversy is not obvious
from the face of the complaint, the party invoking
jurisdiction under CAFA must show that there is a 'reasonable
probability' that the amount in controversy meets the
threshold of $5,000,000." Campbell v. Zerocater, Inc., No.
23-CV-05742, 2025 WL 964106, at *4 (S.D.N.Y. Mar. 31, 2025)
(quoting Blockbuster, 472 F.3d at 58). Courts can consider
"other evidence in the record" when evaluating a pleading
that inconclusively invokes the amount-in-controversy
requirement. Id. (citing United Food & Com. Workers Union v.
CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 305 (2d
Cir. 1994)).

However, an "allegation that the amount in controversy
exceeds $5 million creates a presumption that the amount in
controversy requirement is met." Metcalf v. TransPerfect
Translations Int'l, Inc., 632 F. Supp. 3d 319, 334 (S.D.N.Y.
2022); see also Wolde-Meskel v. Vocational Instruction
Project Community Services, Inc., 166 F.3d 59, 63 (2d Cir.
1999) ("[A] rebuttable presumption [exists] that the face of
the complaint is a good faith representation of the actual
amount in controversy."). The defendant has the burden to

12

show "to a legal certainty" that the amount in controversy is "so patently insufficient" that it fails to satisfy the jurisdictional minimum. <u>See</u>, <u>e.g.</u>, <u>Colavito v. New York Organ Donor Network, Inc.</u>, 438 F.3d 214, 221 (2d Cir. 2006); <u>Blumenthal v. Sea Hotel Co., LLC</u>, No. 99-CV-4881, 2000 WL 1349249, at *3 (S.D.N.Y. Sept. 19, 2000). "The legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim." <u>Porsch v. LLR, Inc.</u>, No. 18-CV-9312, 2019 WL 3532114, at *1 (S.D.N.Y. Aug. 2, 2019) (citation omitted).

Still, courts have recognized that while a rebuttable presumption exists in most cases, a plaintiff must meet a "minimal burden." <u>See</u>, <u>e.g.</u>, <u>Venning v. Primark US Corp.</u>, No. 23-CV-10176, 2023 WL 8188432, at *1 (S.D.N.Y. Nov. 27, 2023) ("Plaintiff fails to meet even [his] minimal burden, as he alleges only conclusorily that the amount in controversy against the Defendant in this matter exceeds the sum or value of $5,000,000, exclusive of interest and costs." (internal quotation marks omitted)); <u>Ballard v. U.S. Bank N.A.</u>, No. 20-CV-5129, 2020 WL 6381134, at *7 (S.D.N.Y. Oct. 29, 2020) ("Plaintiffs bear the burden of establishing jurisdiction and will be unable to show that timely claims . . . could reach $5 million.").

13

Here, Snyder claims that the amount in controversy exceeds $5 million. (See Compl. ¶ 15.) However, the Court finds that Snyder's Complaint does not allege, on its face, facts plausibly suggesting that the amount in controversy as to the named defendants exceeds the jurisdictional minimum. And regardless, Dale has met the burden to rebut any presumption.

As noted, the MCAR Agreement and the Citadel Agreement include provisions stipulating that an attorney would be appointed to represent Snyder "in any enforcement actions." (See Compl. ¶¶ 115, 118 ("MCAR shall 'appoint an attorney of its choice and pay all legal expenses, if any, associated with the civil defense[']" and "Citadel would 'provide [Snyder] with an attorney, pay 100% of that attorney's fees, and pay 100% of the court costs and/or arbitration related fees and costs.'").) Snyder's Complaint meticulously details MCA's alleged "fraudulent" and damaging actions – including assertions, for example, that it was "[a]t the direction of [MCA]" that Snyder stopped making remittances to RDM" and that MCA "provide[d] legal advice" that ultimately resulted in RDM's action against Snyder. (Id. ¶¶ 127-32.) Snyder then claims that attorneys such as Dale are "participants in the . . . network of deceit perpetrated by these Debt

14

Settlement Companies" and asserts that Dale engaged in a "direct collusive effort to commit fraud." (<u>Id.</u> ¶¶ 62, 157.)

Nonetheless, the Court cannot glean from Snyder's Complaint how the alleged damages tie directly to Dale. Nor can it determine the total amount of damages (if any) Snyder alleges he or the class have suffered. As courts in this district have noted, "a plaintiff cannot sidestep the jurisdictional question simply by pleading an indeterminate amount of damages, accompanied by a conclusory statement that the amount-in-controversy threshold is met." <u>LaSala v. E*Trade Sec. LLC</u>, No. 05-CV-5869, 2005 WL 2848853, at *5 (S.D.N.Y. Oct. 31, 2005).

First, Snyder alleges that RDM seeks $16,195 in damages in its pending action. (<u>See</u> <u>id.</u> ¶ 134.) However, Snyder does not claim that he has been held liable under that action. As Snyder asserts in his Complaint, it was MCA that "did not disclose . . . what legal actions would result" if Snyder stopped paying RDM. (<u>Id.</u> ¶ 130.) Snyder claims that Dale "sent a request for payment . . . seeking payment of approximately $18,000 for fees" and a revised request "with a prefilled amount of $3,500." (<u>Id.</u> ¶ 148.) But here again, Snyder does not allege that any transfer of payment was ever made.

Next, Snyder contends that Dale forced him to "incur prejudicial judicial filings made without knowledge or consent" – which increased the costs and fees that MCA incurred – and failed to advise Snyder that the underlying MCAR Agreement required Snyder to pay those litigation costs and fees. (<u>Id.</u> ¶ 11.) But from the face of the Complaint, Snyder fails to plausibly allege how any damages trace directly to Dale. As noted, pursuant to the Citadel Agreement – which incorporated the terms of the MCAR Agreement – Citadel would "pay 100% of [the] attorney's fees, and pay 100% of the court costs and/or arbitration related fees and costs" if an action was brought against Snyder. (<u>Id.</u> ¶ 118.) Snyder also fails to detail how Dale's filings increased MCA's litigation costs or fees, assert the amount of any increase, or claim that he has actually paid additional litigation costs and fees to MCA as a result. Instead, Snyder alleges that companies such as MCA "engage attorneys like [Dale], among others, for one purpose - to delay legal proceedings long enough so that the Debt Settlement Company can fraudulently siphon enough money from the unsuspecting merchant." (<u>Id.</u> ¶ 56.) Snyder contends that Dale's failure to resolve his debts has resulted in further damage, including "interest, increased costs, [and] decreased

16

creditworthiness." (Id. ¶ 155.) But Snyder contracted with MCA – not Dale – to settle his debts, and regardless, Snyder does not allege facts supporting how Dale contributed to MCA's failure. (See id. ¶¶ 102-03.) Snyder cites "prejudicial judicial filings" and asserts that Dale filed an answer in the action brought by RDM, as well as a motion to dismiss, both of which Snyder asserts he never reviewed or approved. (Id. ¶¶ 135-40.) After RDM filed a motion for summary judgment, Dale also submitted an opposition and participated in an oral argument. (See id. ¶¶ 4, 143.) But the court denied RDM's motion and Snyder offers no facts supporting how Dale's other filings were prejudicial. (See Marshall Decl. at Ex. F.)

Snyder claims Dale "completely ignored discovery requests that had been filed on the docket on October 18, 2024, resulting in the waiver of [Snyder's] rights." (See id. ¶ 6.) However, attorneys from B&B had taken over Snyder's representation a week before the discovery deadline, which the court had set for November 28, 2024. (See Marshall Decl. at Ex. G.)

Next, Snyder asserts that even if he has not been held personally liable, Dale has "appeared in hundreds of actions" where he has filed "the same verified pleadings, discovery

requests, and motion papers" - increasing the liability of the putative class members. (Id. ¶ 12.) But "[a]lthough doubts regarding whether the jurisdictional amount is met are resolved in plaintiff's favor," here, "on the present record," this Court "simply has no way to determine" whether Snyder's allegations reach the jurisdictional amount. LaSala, 2005 WL 2848853, at *5.

Finally, Snyder claims an entitlement to damages inclusive of an award of punitive damages and argues that this Court should include that claim in its amount-in-controversy analysis. (See id. ¶¶ 13, 156.) However, although district courts can consider punitive damages, a "trial court is plainly not compelled to accept a claim of punitive damages, however unwarranted, made for the purpose of conferring federal jurisdiction." Zahn v. Int'l Paper Co., 469 F.2d 1033, 1033 n.1 (2d Cir. 1972). Furthermore, "a claim for punitive damages is to be given closer scrutiny . . . than a claim for actual damages" when calculating a jurisdictional amount. Id. Here, because the alleged facts do not plausibly suggest that the claims, in aggregate, meet the jurisdictional minimum, the Court declines to rely on Snyder's punitive damages claim to meet that threshold.

Snyder falls far short of alleging facts that plausibly support a $5 million amount in controversy. Accordingly, Snyder does not satisfy the requirements of Section 1332(d).

2. <u>CAFA Exceptions</u>

Amount-in-controversy requirements aside, Dale argues that even if Snyder could establish subject matter jurisdiction, the Court must decline to exercise that jurisdiction pursuant to two CAFA exceptions – the local controversy exception and the home state exception (<u>see</u> Mem. at 9-11) – which are "designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state." <u>Brook v. UnitedHealth Grp. Inc.</u>, No. 06-CV-12954, 2007 WL 2827808, at *3 (S.D.N.Y. Sept. 27, 2007). "Given CAFA's purpose, and given the burdens of proof applicable to the general removal statute where a statutory basis for exercising federal jurisdiction has been shown, the party opposing the exercise of the Court's established jurisdiction bears the burden of demonstrating that a CAFA exception exists." <u>Brook</u>, 2007 WL 2827808, at *3; <u>see also</u> <u>Mattera v. Clear Channel Commc'ns, Inc.</u>, 239 F.R.D. 70, 79-80 (S.D.N.Y. 2006) ("[T]he Court concludes that CAFA's stated purpose of

19

allowing federal courts to hear more interstate class actions is best furthered by placing the burden of proof on the party seeking to avail itself of a CAFA exception.") The Court applies the preponderance of the evidence standard, in accordance with other courts in this district. See, e.g., Hart v. Rick's NY Cabaret Int'l, Inc., 967 F. Supp. 2d 955, 962 (S.D.N.Y. 2014) ("For the purpose of this opinion, the Court will apply the preponderance of the evidence standard to determine whether a CAFA exception applies.")

Under Section 1332(d)(4)(A) – the local controversy exception – "a district court must decline jurisdiction if: (1) more than two-thirds of the putative class members are citizens of the state in which the action was originally filed; (2) there is at least one defendant from whom significant relief is sought by the class members, whose alleged conduct forms a 'significant basis' for the asserted claims, and who is a citizen of the state in which the action was originally filed; (3) the principal injuries suffered by the class were incurred in the state in which the action was originally filed; and (4) no other class action asserting the same or similar factual allegations has been filed against any of the defendants within the past three years." Mattera,

239 F.R.D. at 77 (internal quotation marks omitted); 28 U.S.C.
§ 1332(d)(4)(A).

Here, the parties dispute whether more than two-thirds
of the putative class members are citizens of New York - the
state in which Snyder filed the action. Pursuant to Section
1332(d)(7), "[c]itizenship of the members of the proposed
plaintiff classes shall be determined . . . as of the date of
filing of the complaint." 28 U.S.C. § 1332(d)(7). Snyder
argues that Dale has not provided "any records to show that
more than two-thirds of [the] class members' citizenship is
in fact New York" and fails to "speak to the . . . class
members' citizenship as of the critical dates." (Opp'n at 7.)
However, Snyder defines both putative classes in his
Complaint as "[a]ll persons[,] merchants, customers and
clients *in the State of New York* who fell victim to
Defendants' direct collusive effort to commit fraud." (Compl.
¶ 157(a)-(b) (emphasis added).) While Snyder is a citizen of
another state, and other putative class members could
theoretically hail from outside of New York too, "[a] court
may make reasonable assumptions about the makeup of the
putative class when determining whether it has jurisdiction
under CAFA." Cunningham v. Pret a Manger (USA) Ltd., No. 19-
CV-02322, 2020 WL 122835, at *4 (S.D.N.Y. Jan. 10, 2020)

(internal quotation marks omitted). Here, the Court reasonably infers that "more than two-thirds of the putative class members" would be citizens of New York, as the Complaint itself defines the class as "[a]ll persons[,] merchants, customers and clients *in the State of New York*." (Compl. ¶ 157(a)-(b) (emphasis added).)

Finally, under Section 1332(d)(4)(B) – the home state exception - "[a] district court is to decline to exercise jurisdiction . . . where the primary defendants and at least two-thirds of the class members are citizens of the State in which the action was originally filed." Brook, No. 06-CV-12954, 2007 WL 2827808, at *5; 28 U.S.C. § 1332(d)(4)(B). This exception therefore applies for the reasons described above, and the Court declines to exercise jurisdiction accordingly.

B.    Section 1332(a) Jurisdiction

Snyder states in his Complaint that "[t]his Court has original jurisdiction based upon [Section 1332(a)]." (Compl. ¶ 16.) To the extent Snyder asserts ordinary diversity jurisdiction pursuant to Section 1332(a), that argument fails for the same reasons discussed above. Federal subject matter jurisdiction based upon diversity is limited and available only when the plaintiff and defendant are of diverse

22

citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. See 28 U.S.C. § 1332(a).

Here again, the crux of the issue is whether Snyder satisfies the amount in controversy – that is, whether he can show the matter "exceeds the sum or value of $75,000" that is required to bring any individual claims. 28 U.S.C. § 1332(a). Although courts analyze the named plaintiff's individual claims pursuant to Section 1332(a) – not the aggregated claims of a class under a Section 1332(d) analysis – the outcome is the same. Snyder alleges no additional facts and does not make any arguments separate and distinct from those described above. See 28 U.S.C. § 1332(a), (d). Accordingly, for the reasons already set forth, Snyder does not plausibly plead the necessary amount in controversy to confer the Court subject matter jurisdiction in this matter.

Because the Court finds that it lacks subject matter jurisdiction over the claims, the Court does not address Dale's argument that Snyder additionally fails to state a claim pursuant to Rule 12(b)(6).

## V.    ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 24) filed by defendants Dominick R. Dale, Esq. and the Law Office of

Dominick R. Dale, Esq. to dismiss the claims alleged by plaintiffs Jon Snyder and Shoreline Appraisal Services Inc., individually and on behalf of all others similarly situated, is **GRANTED,** and the claims are dismissed without prejudice.

**SO ORDERED.**

Dated:     30 October 2025
           New York, New York

                                        _____
                                        Victor Marrero
                                        U.S.D.J.